ATTACHMENT 2

AFFIDAVIT OF
TASK FORCE OFFICER JERE HOLT
U. S. DRUG ENFORCEMENT ADMINISTRATION

I, Jere Holt, being duly sworn, state the following:

<u>INTRODUCTION</u>

I am a Task Force Officer (TFO) for the United States Drug Enforcement Administration (DEA).   Your affiant is an "[i]nvestigative or law enforcement officer" of the United States within the definition of 18 U.S.C. § 2510(7) authorized to investigate crimes for the offenses enumerated in 18 U.S.C. § 2516 and in 21 U.S.C. § 801 et. seq.,  including Asset Seizure and Forfeiture matters defined under 18 U.S.C. § 981(a)(1)(A), 985 and 1956.

<u>PROPERTY SOUGHT FOR FORFEITURE</u>

This affidavit is made in support of a civil complaint of forfeiture against the following property:

A.    $6,400.00 United States currency;

B.    Ford Expedition 2006, Oklahoma tag #958-XPM, VIN# 1FMFU19556LA87027, Registered to Global Star Products LTD, P.O. Box 13620, Oklahoma City, OK 73113;

C.    Lincoln Town Car 2003, Texas tag # V56XYJ, VIN-1LNHM82W03Y700559, Registered to Virtual Money Inc, 1603 LBJ Freeway, Suite 800, Dallas, TX 75234;

1

D.   $7,766.11 in US currency, proceeds from account numbered XXX2591 at Quail Creek Bank. The account was in the name of Cleansip2000. Robert E. HODGINS and Donna M. ANDREW were authorized signatories on the account;

E.   $4,365.35 in US currency, proceeds from account numbered XXX5661 at Quail Creek Bank. The account was in the name of Robert E. HODGINS and/or Donna M. ANDREW. Both were authorized signatories on the account;

F.   $188,914.60 in US currency, proceeds from account numbered XXX2602 at Quail Creek Bank. The account was in the name of Global Star Products, Ltd. (Global Star). HODGINS and ANDREW were  authorized signatories on the account;

G.   $42,265.49 in US currency, proceeds from account numbered XXX7618 at Quail Creek Bank. The account was in the name of Andrew Western, Inc. (Andrew Western).   HODGINS and ANDREW were authorized signatories on the account; and

H.   The house located at 7501 N.W. 210th Street, Oklahoma City, Oklahoma, more particularly described as:

Tract 26

Part of the Southeast Quarter (SE/4) of Section Seventeen (17), Township Fourteen (14 North, Range Four (4) West of the Indian Meridian, in Oklahoma County, Oklahoma, Being more particularly described as follows: Beginning at the Northeast corner of the Southeast Quarter (SE/4); Thence 1321'.64 feet West of the Northeast corner to a point or place of beginning; Thence North 660 feet; thence East 330.42 feet to the point or place of beginning, and having a street address of 7351 N.W. 210th A.K.A. 7501 N.W. 210th, Oklahoma County, Oklahoma 73042,with all appurtenances, improvements, and attachments thereon.

The record owner of the defendant real property
is Andrew Western, Inc., pursuant to Warranty
Deed recorded in Book 7442, Page 0558, records
of the County Clerk of Oklahoma County,
Oklahoma.

The assets listed are subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A), 985 and 1956.

## FACTS AND CIRCUMSTANCES

The facts set forth in this affidavit are based on my personal observations,

my training and experience, and information obtained from various Drug

Enforcement Administration (DEA) agents, as well as reports and affidavits

prepared by other DEA agents/officers.  This affidavit does not purport to set

forth all of my knowledge of DEA's investigation into this matter, only those facts

necessary to support the complaint herein.

6.     In September, 2007, SA Richard Gardner of the Dallas DEA office

began a money laundering investigation of Robert Everett HODGINS and his

Dallas, Texas based stored-value-card company called Virtual Money Inc. (VMI).

This investigation, as well as information developed by the DEA Bridgeport

Resident Office and the United States Secret Service (USSS), showed that

HODGINS and VMI were facilitating the transfer of drug and other criminal

proceeds from the United States and Mexico to Colombia and other South

3

American countries. The VMI card system allowed near anonymity as to the sender of these monies as well as the recipients, making the VMI business a "front" for drug-related money laundering activity.

7.      As part of this investigation, a Confidential Source of Information (CS), with a proven history over 10 years of providing credible information, was used to infiltrate VMI and befriend HODGINS. During the course of the CS's interaction with HODGINS and other VMI franchise holders, it was learned that HODGINS and the VMI employees were very familiar with the laws and regulations regarding money laundering. Through meetings, e-mails and training sessions, the CS was able to learn of and record the steps that HODGINS, VMI employees and various VMI franchise holders employed to side step money laundering regulations and avoid detection of money laundering violations. These methods were freely discussed and considered normal business activities.

8.      As the investigation continued, the CS was able to ask HODGINS if he would assist the CS in laundering drug proceeds for the benefit of the CS's uncle whom HODGINS had previously met. The CS told HODGINS that his uncle needed the money transferred to an account overseas and that, if the transfer was successful, more and larger amounts would be provided to HODGINS. HODGINS agreed to conduct this and other transfers, for a fee of 10% of the amount to be transferred, through his company, VMI.

9.     In order to gain the confidence of HODGINS, on February 19, 2008, in Dallas, TX, the CS acting at the direction of law enforcement, provided $30,000.00 in official government funds that were purported to be "drug proceeds" to HODGINS for the purpose of purchasing a VMI "Agent" franchise. HODGINS was told by the CS that his "uncle's friends" were the source for these monies and were paying this money as a sign of good faith on their part as well as to prove to HODGINS that they were "serious" about conducting business. HODGINS readily accepted this cash money on the behalf of VMI in his personal business office at VMI. During the course of this meeting, the CS asked HODGINS if he would be reporting this cash payment to the "authorities."  Even though a federal report is required regarding cash payments in this amount, HODGINS told the CS that a report would not be made, and no such report was made.

10.     Computer checks for Currency Transaction Reports (CTR's) filed with the US Department of the Treasury show that no CTR's were filed by or for HODGINS or VMI making large size cash deposits (over $10,000.00) into any financial institution within the United States for the time period of February 19, 2008, to August 18, 2008. This would have shown if HODGINS or VMI had placed the $30,000.00 in "drug proceeds" into the monetary system. The lack of CTR's regarding the $30,000.00 is indicative of a business not following standard

business practices by depositing cash receipts into a checking or savings account within a timely manner. This is indicative of criminal behavior by someone who wants to conceal his or her cash based activities.

11.   The investigation determined that HODGINS was a Canadian citizen, and maintained a residence at 7501 N.W. 210th Street, Oklahoma County, and also kept an apartment in Dallas, Texas, near his office.

12.   On March 25, 2008, in Lewisville, Texas, the CS acting at the direction of law enforcement provided $100,000.00 in official government funds that were purported to be "drug proceeds" to HODGINS for purposes of money laundering. The CS also provided to HODGINS the name, location and bank account number of a DEA undercover bank account in the Dominican Republic. HODGINS told the CS that he would send the money to the bank account near the end of June, 2008. In accepting the drug proceeds for money laundering purposes, HODGINS was violating 18 U.S.C. § 1956(a)(3).

13.   After receiving the "drug proceeds" from the CS, HODGINS was surveilled as he departed the area and traveled to his apartment in Flower Mound, TX, and then to his office at VMI located in nearby Dallas, TX. On March 25, 2008, HODGINS departed his apartment in Flower Mound and traveled to his residence at 7501 NW 210th Street, Oklahoma County.

6

14.    Computer checks for Currency Transaction Reports (CTR's) filed with the U.S. Department of the Treasury show that no CTR's were filed for HODGINS making large size deposits (over $10,000.00) into any financial institution within the United States for the time period of March 25, 2008, to August 18, 2008. This would have shown if HODGINS had placed the "drug proceeds" into the monetary system.

15.    Upon return from a trip to Mexico City, Mexico with HODGINS during the week of May 9 2008, to May 23, 2008, the CS was again debriefed by S/A Gardner regarding the status of the "drug proceeds" transfer. The CS again stated that HODGINS had stated that he had not transferred the money as of then and was waiting until he had finished an upcoming trip to San Francisco, CA before transferring the money.

16.    On May 30, 2008, S/A Gardner checked with S/A Loretta Moore of the DEA Caribbean Division regarding any transfer of funds into the undercover account, and S/A Moore confirmed that no money had been deposited.

17.    Dallas agents Gardner and Saldivar advised your affiant that during the course of these money "pick-ups," HODGINS utilized the black Ford Expedition (described above) in order to obtain and transport the drug related funds provided to HODGINS by DEA.  It is titled in Global Start Products LTD.

The Lincoln Town Car described above is registered to Virtual Money Incorporated, the business indicted in Connecticut for money laundering.

18.    Upon request of the Dallas Division agents responsible for the above described investigation, on August 20, 2008, the Oklahoma City DEA/HIDTA unit executed a search warrant at 7501 NW 210th Street, Oklahoma County, Oklahoma, the residence of HODGINS and ANDREW.   This warrant was based on the affidavit of SA Gardner.  During the course of this search warrant, officers located U.S. currency in the amount of $18,900.00 stacked together in a small fire safe in the office area of the residence.  TFO Saldivar identified the yellow sticky notes on the two bundles as notes which he stated he and other agents had placed on money bundles that were originally provided to HODGINS during the delivery of  $100,000.00 of purported drug proceeds, which HODGINS had agreed to launder.  TFO Saldivar stated that he believed these bundles were from his "Highwire" funds, which are funds utilized by DEA in this type of undercover operation.

19.    On August 27, 2008, the Dallas Division agents determined that the two bundles that had the yellow sticky notes on them, would be transferred to Dallas for disposition as per SOP for "Highwire" funds, and the remaining two bundles would be processed by the OCDO via administrative forfeiture.  The total amount of funds transferred to the Dallas Division on August 27, 20018, was

8

$12,500.00.   The total amount maintained for forfeiture by the Oklahoma City District Office was $6400.00.  The $6400.00 was in denominations of 20 - $100 bills = $2000 and 88 - $ 50 bills = $4400 for a TOTAL of $6400.00.  The currency located during this search warrant was banded with the same bands as the currency from the Dallas search warrant.

20.    Also seized during this warrant service were numerous documents including statement of accounts from Quail Creek Bank N.A. with account numbers XXX2591, XXX7618, XXX5661 and XXX2602, as more fully described in Paragraph 1.

21.    HODGINS and ANDREW were signatories on each account, as set forth above.  An initial review of the records reflects that funds were commingled between the above listed accounts and, in some instances, VMI accounts and/or parties connected to VMI.  Agents have located such transfers including the following.

    A.    $124,980.00 wire transfer on August 14, 2008, from a VMI account, to the Global Star account;

    B.    Check No. 7852 on the Global Star account, dated February 7, 2008, to VMI for $35,000.00;

    C.    Check No. 7881 on the Global Star account, dated March 14, 2008, to VMI for $17,500.00;

D.      Internet deposit to Global Star account, from Cleansip account, on April 4, 2008, in the amount of $20,000.00;

E.      Check No. 2578 on the Andrew Western account, dated June 8, 2008, to Howard Bagby (believed to be an officer of VMI) for $250,000.00;

F.      Check No. 7968 on the Global Star account, dated July 15, 2008, to Howard Bagby for $100,000.00;

G.      Wire transfer from VMI to Global Star account, dated July 18, 2008, for $174,980.00;

H.      Check No. 6188 to HODGINS, from Macgillivray Trust, dated July 18, 2008, for $1,000.00, deposited into the personal account of HODGINS and ANDREW, with memo section stating for "Virtual Money Car"; and

I.      Internet deposit to the personal account of HODGINS and ANDREW, dated August 14, 2008, in the amount of $5,000.00.

Likewise, there were cash deposits, including the following:

J.      Cash deposit of $7,295.09 on January 18, 2008, into Andrew Western account;

K.   Cash deposit of $7,500.00 on June 2, 2008, into Andrew
     Western account; and

L.   Cash deposit of $2,000.00 on June 4, 2008, into Global Star
     account.

This affiant knows from training and experience that individuals involved in advanced money laundering schemes often use multiple personal accounts and business accounts in order to move money back and forth, in an effort to make it appear to have a legitimate origin, and hide illicit activity from government regulators/law enforcement.  Further, cash deposits, in amounts below the $10,000.00 threshold for filing a currency transaction report are also common to money laundering schemes.

22.   According to SA Eileen Dinnan from the Bridgeport, Connecticut DEA office,  ANDREW was present several times at the VMI office in Dallas, Texas, and was even present on the day of undercover operations.  ANDREW was also present at meetings with a CS in both California and Mexico, and took place in negotiations regarding the movement of funds through the same illegal methods described herein.  SA Dinnan told your affiant that her investigation indicated that ANDREW was a corporate officer for VMI, and actively recruited agents for the company with HODGINS, and participated in trips for the company.

23.     On one of the days that ANDREW was identified as present at the VMI offices, SA Dinnan met with HODGINS in an undercover capacity, and he discussed the operations of VMI with her.  HODGINS explained that the stored value cards are not registered to anyone and no social security number is associated with any card.  SA Dinnan told HODGINS that many of her clientele are large cash clients and that is one of the hurdles she always has to overcome. HODGINS advised that he had solved that problem, which is why he does so well in third world countries -- and that he has moved millions of dollars, and no one even knows what is happening.   He stated that he has money moving all of the time and his "goal has to be to beat the system" because he has to.  He stated that he can bring money out of any country in the world.

24.     Robert HODGINS, VMI, and others are indicted in Case No. B-07-1, United States District Court, District of Connecticut.  The Superseding Indictment charges them with conspiring to commit money laundering and charges VMI and others with various specific acts of money laundering, seeking forfeiture of $7,120,000.00 as property involved in the offenses or traceable thereto.

25.     The Superseding Indictment charges the defendants and others conspired to conduct financial transactions that involved the proceeds of the manufacture, importation, sale, and distribution of  controlled substances, in violation of  18 U.S.C. § 1956(a)(1)(B)(I).  More specifically, it charges:

(a)     Medellin, Colombia brokers arranged to transport to Colombia from the United States proceeds of the sale of controlled substances, including cocaine, by agents of their Colombian clients.  Those brokers directed individuals in the United States to use the proceeds of the sale of controlled substances to pay off the debts or obligations of Colombian importers by making deposits into accounts at financial institutions in the United States.  In return for having their obligations covered, the Colombian importers paid the brokers in Colombian pesos.  The United States currency would be transported within the United States by couriers.

(b)     The brokers also arranged to transport U.S. dollars that were the proceeds of the sale of controlled substances from the United States to Colombia using the services of VMI and individuals.  It alleges VMI is a corporation located in the Dallas, Texas area that creates plastic cards containing magnetic strips ("stored value cards"), which can be "loaded" with amounts of money, so that corresponding stored value cards can be used at remote locations to withdraw money from remote financial institutions up to the amount of money with which the corresponding cards have been "loaded."   The cards are "loaded" by agents of VMI, of which Robert HODGINS is the president.

(c)     It was a part of the conspiracy that the brokers directed their agents in the United States to provide proceeds of sales of controlled substances

to agents of VMI to be sent to Colombia so the proceeds could be made available to the clients of the brokers.

(d)    It was a part of the conspiracy that agents of VMI loaded the proceeds in U.S. dollars provided to them by agents of the brokers onto stored value cards, and their agents and agents of their clients in Colombia retrieved the proceeds in Colombian pesos through ATM machines in Medellin, Colombia.  It alleges that VMI stored value cards were used by the members of the conspiracy to make available at a Daviviendo Bank ATM in Medellin, Colombia the peso equivalent of the following amounts of U.S. currency:   $2,430,810.24 in April 2006; $2,437,023.53 in June 2006; and $2,257,761.45 in August 2006.

26.    It should be noted that at the time of this affidavit,  HODGINS is still a federal fugitive, and ANDREW is believed to have been out of country with HODGINS.  On or about January 2009, ANDREW traveled to Dallas, Texas, where she met Donna Blackman, the person that ANDREW appointed to be treasurer of VMI.  At that time she provided a check drawn on an Andrew Western account to pay for the rent on the VMI offices.

## TRAINING AND EXPERIENCE

I have been a Task Force Officer (TFO) for the United States Drug Enforcement Administration (DEA) for two years.  Since September of 2005, I have been as a peace officer employed by the State of Oklahoma as a Senior Probation and Parole Officer for the Oklahoma Department of Corrections from September 2005 to June 2008. Since July of 2008, I have been employed as a Criminal Investigator with the 21st Judicial District Attorney's Office.  I am currently assigned to the Oklahoma City District Office High Intensity Drug Trafficking Areas Unit and have been for the past  two years.  During this time, I have served as a full time federally deputized DEA task force agent in the DEA Oklahoma City District Office.  I have participated in numerous narcotics investigations involving the seizure and forfeiture of numerous financial assets acquired by individuals through the sale and distribution of controlled substances. During this time, I have worked almost exclusively on narcotics investigations, involving the smuggling, manufacture and distribution of controlled substances and the subsequent illicit transfer and laundering of the proceeds derived from the sale of narcotics.

As a result of approximately five years of law enforcement experience, I have received specific training in the investigation of financial related crimes, money laundering, asset forfeiture laws, and asset forfeiture policies and

procedures.  I have  participated in hundreds of investigations that involved

individuals suspected of distributing illegal drugs and have extensive experience

regarding the manner in which drug distributors obtain, finance, manufacture,

transport, store, and distribute their illegal drugs, as well as how they attempt to

conceal and launder their proceeds from the sale of such illegal narcotics,

including the use of "cover" businesses, and individuals whose sole role in the

drug organization is to launder drug proceeds.  I have also participated in

investigations utilizing these same techniques as it applies specifically to money

laundering of drug proceeds, including the use of undercover methods of actually

laundering undercover "drug funds" through suspects and their businesses which

they use to facilitate their money laundering activity.  I am currently involved in

the investigation of the above described assets.  As discussed above, there has

also been an extensive investigation of Robert HODGINS, VMI, and others, in

Dallas, Texas, and in Connecticut.


## CONCLUSION

27.    From training and experience, this affiant believes that the assets

sought herein were being utilized by individuals who habitually used their

personal and business accounts to facilitate money laundering activity, and

knowingly avoid banking regulations, and, therefore, are subject to forfeiture

pursuant to 18 U.S.C. § 981(a)(1)(A), 985, 1956.

     Further, Affiant sayeth not.

JERE HOLT
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this _19th_ day of July, 2010.

My Commission Expires:
October 25, 2011

Wanda M. Schirf, Notary Public
Commission Number 99015532

17